IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

DAVID PAUL HAMMER,

Defendant.

CRIMINAL ACTION
NO. 4:96-CR-0239

## OPINION

**Slomsky, J.**                                                        **May 29, 2014**

## I.       INTRODUCTION

Before the Court are six motions filed by Defendant David Paul Hammer predicated on

information recently disclosed by the Government:  (1) a Motion to Supplement/Amend His

Motion to Vacate, Set Aside or Correct the Judgment and Sentence Pursuant to 28 U.S.C. § 2255

In Light of Recent Disclosures By the Government (Doc. Nos. 1640, 1641, 1642);  (2) a Motion

in Limine to Preclude the Government from Seeking Death on the Basis of a Prior Conviction

and Other Evidence that Was the Product of Perjured Testimony (Doc. Nos. 1643, 1644);  (3) a

Motion in Limine to Preclude/Suppress the Testimony of Leonard Yager (Doc. Nos. 1645, 1646);

(4) a Motion in Limine to Preclude the Admission of Prior Testimony of Stephen Classen (Doc.

Nos. 1647, 1648);  (5) a Motion to Preclude the Capital Prosecution Where the Government's

Capital Authorization and Subsequent Deauthorization Determinations Relied on Convictions

and Evidence that Were the Product of Perjured Testimony in Violation of the Fifth and Eighth

Amendments (Doc. Nos. 1649, 1650); and (6) a Motion in Limine to Dismiss This Capital

Resentencing Because Of The Governments Presentation of Perjured Testimony And Repeated

Misconduct In Suppressing A Substantial Volume Of Material Exculpatory And Impeachment

Evidence And Its Use Of A Clandestine Agent To Illegally Gather Incriminating Evidence (Doc.

1

Nos. 1651, 1652).  The Government submitted a Consolidated Brief in Opposition to the

Motions.  (Doc. No. 1684.)  For reasons that follow, the Motions will be denied.

## II.    BACKGROUND

On September 18, 1996, a Grand Jury returned an indictment against Defendant David

Paul Hammer.  (Doc. No. 1.)  He was charged with killing Andrew Marti at the Allenwood

Federal Correctional Complex in White Deer, Pennsylvania on April 13, 1996, in violation of 18

U.S.C. § 1111.  (Id.)  On April 9, 1997, the Government filed a notice of its intent to seek the

death penalty.  (Doc. No. 93.)  At the time, this case was before the Honorable Judge Malcolm

Muir, a U.S. District Court Judge who is now deceased.

Trial began on June 2, 1998, following jury selection for both the guilt and penalty phase,

and continued until June 22, 1998.  (Doc. Nos. 448, 489-503.)  On June 22, 1998, after fourteen

days of trial, Defendant withdrew his not guilty plea and admitted killing Marti with

premeditation and malice aforethought.  (Doc. No. 504.)  The court conducted a colloquy with

Defendant to confirm that the plea was knowingly, voluntarily, and intelligently made.  (Doc. No.

1684 at 5.)  The court found Defendant competent to plead guilty and accepted his plea.  (Id. at

7.)

On June 30, 1998, a hearing commenced to determine whether the death penalty should

be imposed, in accordance with 18 U.S.C. § 3593(b).  (Doc. No. 553.)  The hearing continued

until July 20, 1998.  Under the Federal Death Penalty Act ("FDPA"), in order for a defendant to

be eligible for the death penalty, the Government must prove beyond a reasonable doubt (1) the

defendant is eighteen years or older; (2) that the defendant acted with the requisite intent

pursuant to 18 U.S.C. § 3591(a); and (3) the existence of one statutory aggravating factor.  See

18 U.S.C. §§ 3591(a), 3592(c), 3593(c), (e).  The statutory aggravating factors are listed at §

3592(c)(1)-(16).  The Government sought to prove that Defendant had acted with the requisite

intent by committing the murder after substantial planning and premeditation, 18 U.S.C. § 3592(c)(9).  The Government also sought to prove the statutory aggravating factor that Defendant had previously been convicted of a state or federal offense punishable by a term of imprisonment of more than one year that involved the use, or attempted or threatened use, of a firearm against another person, a statutory aggravating factor under 18 U.S.C. § 3592(c)(2).

One of the two convictions relied on by the Government in support of the aggravator for a prior firearm conviction under Section 3592(c)(2) was State v. Hammer, CRF 84-1310 (the "Upton case" or the "Upton shooting").  That case involved charges of kidnapping, robbery with a firearm, and shooting with intent to kill, and resulted in an aggregate sentence being imposed of 1,200 years.  (Id.)

On July 21, 22 and 23, 1998, at the death penalty hearing, counsel gave closing arguments.  (Doc. Nos. 565-567.)  On July 23, 1998, the jury began its deliberations.  It returned a verdict on July 24, 1998 that Defendant receive the death penalty.  (Doc. No. 572.)  On November 4, 1998, after denying motions for a new trial, the district court imposed the death penalty.  (Doc. No. 648.)

The Third Circuit granted Defendant's motion for voluntary dismissal of his direct appeal, United States v. Hammer, 226 F.3d 229 (3d Cir. 2000), cert. denied, 532 U.S. 959 (2001), and denied a rehearing petition seeking reinstatement of the appeal.  See United States v. Hammer, 239 F.3d 302 (3d Cir. 2001), cert. denied, 534 U.S. 831 (2001).

### A.  The § 2255 Proceedings and Brady Material

On March 29, 2002, Defendant filed a Petition for Writ of Habeas Corpus collaterally attacking his conviction and sentence pursuant to 28 U.S.C. § 2255.  (Doc. No. 767.)  This was

within the one-year limitations period measured from the Supreme Court's October 1, 2001

certiorari denial.  See 28 U.S.C. § 2255.

Judge Muir held an evidentiary hearing on the § 2255 petition.  The hearing began on

July 14, 2005 and continued intermittently until September 29, 2005.  On December 27, 2005,

Judge Muir issued an Opinion denying Defendant's request to withdraw his guilty plea but

granting him a new penalty phase hearing.  United States v. Hammer, 404 F. Supp. 2d 676 (M.D.

Pa. 2005).  Judge Muir found, in part, that as a result of the Government's failure to disclose

material exculpatory evidence, the prior sentencing proceeding was constitutionally defective in

violation of Brady v. Maryland.  Id. at 801 (citing 373 U.S. 83, 215 (1963)).  The court also found

that some of the jury's findings on mitigating factors were erroneous.  Id.  Accordingly, on July

9, 2009, Judge Muir ordered the Government to file a motion to have this case placed on a trial

list for a new penalty phase trial within sixty days.  (Doc. No. 1245.)

The Brady violations that Judge Muir found were based on FBI 302 reports which

contained interviews of state and federal inmates who had been incarcerated with Defendant at

various times.  These interviews were not disclosed by the Government.  (Doc. No. 1684 at 30-

33.)  Three inmates reported that Defendant was a sado-masochistic homosexual with a fondness

for bondage.  They were (1) Albert Ray Johnson; (2) Royce Lee Fowler; and (3) Gaylon Don

Ball.  (Id.)  Defense counsel testified at the hearing that had they been able to review these FBI

302 reports, they would have investigated and presented Hammer's history of sexual bondage.

(Id.)  Defense counsel also stated that the information would have been used to corroborate

Defendant's allegation that he initially restrained decedent Marti for sexual purposes only, and

would have countered the Government's penalty phase argument that the preparation of the

restraints supported the "substantial planning and premeditation" aggravating factor.  (Id.)

4

Both parties appealed the district court's Section 2255 Order. Defendant appealed the district court's denial of guilt phase relief, and the Government appealed the district court's order vacating the death penalty and granting resentencing. The Third Circuit granted a certificate of appealability for only three issues raised by Defendant. The Third Circuit did not grant a certificate of appealability with regard to any claim by Defendant that his guilty plea was subject to attack.

Defendant moved to dismiss the Government's appeal, arguing that the district court's Order was not a final, appealable judgment. The Third Circuit agreed that the district court's Order granting a resentencing was interlocutory and could not be reviewed on appeal until the resentencing had been completed and a final judgment was entered in the criminal prosecution. United States v. Hammer, 564 F.3d 628, 634-35 (3d Cir. 2009).

Thereafter, Defendant submitted a request for the Department of Justice ("DOJ") to reconsider its decision to seek the death penalty. The DOJ reviewed the case. (Doc. No. 1289 at ¶ 8.) The review concluded on January 6, 2011 when Attorney General Eric Holder authorized the prosecution to seek the death penalty against Defendant. (Doc. No. 1300.) On January 7, 2011, the Government filed a motion requesting that the case be placed on the trial list for a new penalty proceeding. (Id.)

On January 12, 2011, Judge Muir entered an Order reassigning the case to this Court. (Doc. No. 1301.) The resentencing hearing is set to take place before this Court in June 2014.

### B. The Facts Underlying the Present Motions

#### 1. Thomas Upton

In support of the death penalty, the Government seeks to admit evidence that Defendant had previously been convicted of a state or federal offense punishable by a term of imprisonment

of more than one year that involved the use, or attempted or threatened use, of a firearm against another person. See 18 U.S.C. 3592(c)(2). Specifically, in State v. Hammer, CRF-84-1310, Defendant was convicted of kidnapping, robbery, and assault with a gun in connection with the shooting of Thomas Upton.

The incident with Upton occurred on October 27, 1983. On that date, Defendant escaped from the Oklahoma State Reformatory at Granite, Oklahoma. (Doc. No. 1684 at 39.) According to Upton, Defendant carjacked his car and forced him to drive to a secluded area where he shot him in the head three times. Upton testified at two preliminary hearings and a trial in connection with the shooting. (Id.) Although the details of some of his testimony varied, Upton consistently testified that at the time of the incident, Defendant had approach Upton's car on the street brandishing a firearm and demanding that Upton drive to a motel. (Doc. No. 1643 at ¶ 3.) Once inside the motel room, Upton fought with Defendant and Defendant struck him multiple times during the fight. At one point, Defendant locked Upton in the bathroom, during which time Defendant made two phone calls. Defendant then made Upton drive to an oil-filled dirt road on the outskirts of Oklahoma City, take his clothes off, and lie face down on the dirt, and shot Upton three times in the head. (Id. at ¶ 4.) Upton testified that after the third shot, "the lights didn't go out, so I jumped up and took off running. Hammer started jumping up and down and screaming and run [sic] to my car and got in it and took off." (Doc. No. 1684 at 41.) The Government also introduced facts of this incident through David Walter (a reporter) and William Louis Earl Keel (an Oklahoma state prosecutor). (Id. at 25.) Based on these facts, Defendant was convicted in Oklahoma of (1) kidnapping; (2) robbery with a firearm; and (3) shooting with intent to kill. (Id. at 39-40.) The jury rendered the prison sentence and imposed a sentence of 12,00 years imprisonment. (Id. at 40.)

6

In 2004, Defendant published an autobiographical book entitled "The Final Escape,"
which cast some doubt on the carjacking aspects of Upton's testimony.  (Id. at 43.)  In his book,
Defendant described the events following his escape:

> I had decided earlier that I was going to go to one of the gay bars.
> My reasoning was that it would be easier to get picked up there.
> Most of the guys have their own apartments or house, have a car,
> clothes, credit card, and money – all making it an easy place to rob
> someone, take their vehicle and leave the state.  So I took a cab to
> one of the gay bars in the northwest part of the city.  After I had
> been there a little while a guy picked me up.  He offered to take me
> to dinner.    This gave me the clue that he had his own
> transportation.  We had dinner and directly from there he wanted to
> have sex.  Unfortunately he said that he still lived with his mother.
> I am thinking, "I've picked up a loser but at least he's got a car and
> probably a little money."  I'd had a couple of screwdrivers and, not
> being used to alcohol, I had a little buzz going.  So I took him back
> to my motel room.  We were sitting there having a drink when the
> 10:00 PM news came on TV.  It showed my face and this guy
> recognized me.
>
> "My God, that's you," he said excitedly.  So he turns up the sound
> and listens to the broadcast.  Then he makes a very big mistake.
>
> "You know, I could turn you in," he says.
>
> So I walked over to the nightstand, took out a pistol, pointed it at
> him and said, "Mother F*cker, I could kill you."  He tried to tell
> me that he was just kidding and I sarcastically said, "Yeah, sure,
> you're just kidding."   I walked over to him and slapped him
> alongside his head with the pistol.  Blood started to run and he was
> whining and pleading that he was just kidding, and begging me not
> to kill him.  Then I told him to take off his clothes since he wanted
> some sex.  In the process I hit him a few more times and he bled all
> over the bed.
>
> This entire time my mood had been swinging from anger, to
> frustration, to disgust for this son-of-a-bitch who said he was going
> to turn me in, and at that moment I decided I was going to kill him.
>
> I apologized for hurting him, I told him that I was just into rough
> sex.  After reassuring him that I wasn't going to hurt him, I told
> him to go into the bathroom and get cleaned up.  I said I was going
> to make a phone call and didn't want him to hear it.  I called my

Mom and told her that I was leaving the area and that I'd call her when I could.

I saw the blood on the pillowcases and sheets so I gathered everything up just as he walked out of the bathroom. I told him all I wanted him to do was to take me somewhere and drop me off. I already knew that he was going to tell on me.

We left the motel and I told him which way to drive. To get his attention and keep him in line I shot through his open window a couple times. It nearly scared him to death. By then it was around 12:30AM. We drove to the outskirts of the city where I had spent a great deal of my teenage years. We stopped and I told him that I had changed my mind. I was going to take his car and leave him there. He readily agreed to it. Once out of the car I told him to take off his shoes and he did. In the distance a porch light came on and dogs started barking. I told him to get back into the car, and directed him to another part of the city to an oil lease. It was in the far southwest part of town. We parked by a cattle guard, the gate that leads into the oil well. I had told him to take the rest of his clothes off, and that is how I would leave him. Once he had stripped he began to beg for his barber tools. I agreed to give them to him, but had no intention of doing so. We opened the trunk and took them out. Then I threw them in the back seat. We walked down the trail, and then I told him to lie down on his stomach. Again he begged me not to kill him. I told him to shut up, shoved the barrel of the gun into his mouth, and told him to suck on it.

I really don't know how I was feeling at that moment, but I know that he should never have said he was going to turn me in. So I hit him a few more times before I told him to lie down in the gravel. I took the pistol and put it just inches from him head and BOOM. I shot him once and he turned his head over, weakly raising his hand. I knew I could not miss him so I shot three more times in rapid succession. When I shot again the gun just clicked. I had forgotten that I had shot it twice before so I stood up to reload. This guy jumped up stark naked, and took off running. I had already shot him four times in the head. It was very dark so I could not find him. Since I had shot so many times I figured that he would be dead before anyone discovered him. I took the car to the gas station, filled it up, and dumped the bloody sheets, etc., into a dumpster out back, and I was on my way.

David Paul Hammer, The Final Escape, 116-19 (2004).

On March 10, 2014, Capital Crimes Section Trial Attorney Amanda Haines and FBI Special Agent John Coyle met with Upton as part of their preparation for the upcoming resentencing hearing. (Doc. No. 1684 at 45.) During the course of this interview, Upton disclosed that, contrary to his testimony in 1984 and 1998, he first saw Defendant in Oklahoma City when Upton picked up Defendant at a gay bar because "he thought he was cute" as "a trick." (Id. at 46.) Contrary to his earlier testimony, Upton stated that he voluntarily drove Defendant to his motel to have sex with him. (Id.) At that point, Upton was not carjacked or kidnapped, nor did Defendant display a weapon. (Id.) Upon arriving at the motel, Upton voluntarily accompanied Defendant into his room. (Id.) Once there, Defendant forced Upton to engage in anal sex against his will. (Id.) At some point, Upton told Defendant that he knew he was an escapee, and it was then that Defendant retrieved a firearm from a nightstand in the motel room. (Id.) Upton went into the bathroom at Defendant's direction so that Defendant could make a phone call, but he was not locked in the bathroom by Defendant. (Id.) The remainder of Upton's recollection is largely consistent with his prior testimony. (Id.) Defendant forced Upton at gunpoint to drive to a location, strip off his clothes, and lie down, and then he shot Upton in the head three times. (Id.) Upton explained that he had lied about some of the circumstances leading up to the shooting in his prior testimony because he was concerned about being discriminated against by law enforcement as a homosexual victim. (Id. at 46-47.)

Upton's latest version of events was disclosed to defense counsel on March 11, 2014, along with the FBI report of the interview. (Doc. No. 1642, Ex. 2.) That report noted that around the time of the federal trial, someone had challenged Upton on whether he and Defendant had met at a gay bar on the night of the shooting. (Doc. No. 1684 at 47.) Upton had denied the allegation. (Id.) Upton now reports that it was Lou Keel, the Oklahoma State prosecutor, who

9

had asked him that question.  (Id.)  Upton states that he had never revealed the true

circumstances of how he picked up Defendant prior to the recent interview.  (Id.)

     In response to the information obtained in the recent interview with Upton, defense

counsel is seeking not only to preclude the Government from admitting evidence of the Upton

conviction, but also to prevent the Government from calling Upton as a witness at the

resentencing hearing.

### 2.  Leonard Yager

     While housed at the Allenwood Federal Correctional Complex, Defendant's first cellmate

in the Special Housing Unit ("SHU") was Leonard Yager.  (Id. at 9.)  Yager served as an orderly

and was free to move about the block and to pass items, including notes, from one inmate to

another.  (Doc. No. 1645 at 3.)

     On April 13, 1996, upon discovery of Marti's murder, Defendant was interviewed by law

enforcement personnel, including Carlyle Rick Thompson, a Special Agent with the FBI.  (Doc.

No. 1684 at 48.)  During this interview, Defendant confessed to the murder and revealed that

Yager had known about it.  (Id.)  Upon completion of this interview and after his confession,

Defendant said, "I had better get me a lawyer."  (Id.)

     Special Agent Thompson then interviewed Yager, who was a reliable source for the

Special Investigative staff at USP Allenwood.  (Id. at 15; Doc. No. 1642, Ex. 6.)  Yager

confirmed that Defendant confided to him that he was going to kill Marti.  (Doc. No. 1684 at 15.)

Likewise, on April 13, 1996, Yager told Special Agent Thompson that he recalled a conversation

in which Defendant told him that he was going to kill Marti.  (Id.)  The report of the interview

reads, in part:

> Yager recalled a conversation in which Hammer told him that he
> (Hammer) was going to kill Marti.  Yager thought that Hammer

was only going to hurt Marti, and was not taken in the context of his actually killing Marti. Yager recalls Hammer, on a number of occasions, telling him that he was going to kill Marti.

Yager recalls that a day or so ago, he observed Hammer braiding some cut up sheets. Yager asked Hammer what he was doing and what it was for, at which time Hammer put his hand to his throat, indicating hanging.

(Id.)

Yager testified at both the grand jury and Defendant's trial. He provided the following facts. When Marti was in the SHU outdoor recreation cages, Defendant would gaze out of his cell window at Marti. (Id. at 9.) Defendant talked about Marti on a daily basis and mentioned wanting to have sex with him. (Id.) Defendant also said that he intended to kill Marti, but Yager shrugged this off as idle talk. (Id.) At Defendant's request, Yager delivered notes between Defendant and Marti. (Id. at 10.) After the murder, Yager asked Defendant why he committed the murder. (Id. at 16.) On April 15, 1996, Defendant wrote a note identifying the "seven reasons" why he killed Marti ("The Seven Reasons"), which he provided to Yager. This note appears in Government Exhibit 32.2 and describes, among other things, Marti's prior act of disrespect. (Id. at 49.) Defendant also wrote, "Given the opportunity, I will kill again!" (Gov. Ex. 32.2.)

On April 17, 1996, law enforcement interviewed Yager for a second time. (Doc. No. 1684 at 49.) During this interview, Yager told Special Agent Malocu that he had received a letter from Hammer explaining his motives for committing the murder. (Id.) Yager also said that he wanted to use this information to secure a transfer to another facility. (Id.) Yager maintained that Defendant initiated the contacts with him and gave him "The Seven Reasons" why he killed Marti, which Yager provided to the FBI. (Id.) In the years that followed, Yager was consistent

on this point. (Id.)  On April 17, 1996, Defendant was transferred to the Federal Correctional

Institution at Allenwood and had no further interactions with Yager. (Id. at 50.)

At trial, Yager also identified Government Exhibit 32.1 as one of the notes that Defendant

passed to him. (Id.)  Yager also testified that the only benefit he was to receive from the

Government in exchange for his testimony was transfer to a lower security prison and a

recommendation that he receive a sentence reduction in his case in the Western District of

Tennessee. (Doc. No. 1642 at 24.)

Eighteen years later, on February 25, 2014, Yager was interviewed by prosecutor Amanda

Haines and FBI Special Agent Thomas Herbst in Memphis, Tennessee, in preparation for the

resentencing hearing. (Doc. No. 1684 at 50.)  During this interview, Yager stated that he served

as a long time informant for Lieutenant John Bell of the Bureau of Prisons and that the FBI "sent

him in" to talk to Defendant. (Id.)  When Haines and Agent Herbst showed Yager "The Seven

Reasons," which he had previously authenticated in the grand jury and at trial, Yager claimed

that he did not recognize the document. (Id.)  Yager also confessed that he had recently ingested

heroin in violation of his probation. (Id.)  The Government disclosed this information to defense

counsel. (Id.)

On April 1, 2014, Haines and lead FBI Special Agent John Coyle interviewed Yager for a

second time in Memphis, Tennessee. (Id. at 51.)  During this second interview, Yager denied that

he was directed by the FBI, the Bureau of Prisons, or anyone else to seek information from

Hammer regarding Marti's death or that he had ever made such representations to Haines or

Special Agent Herbst. (Id.)  Instead, Yager claimed that he was not enlisted by law enforcement

to obtain information in this case, but that Defendant voluntarily provided him with "The Seven

Reasons" to satisfy Yager's curiosity. (Id.)  Also during the interview, Yager revealed for the first

time that Defendant had told him that "The Seven Reasons" would assist Yager in his interviews with law enforcement by corroborating his story. (Id.) This second interview was memorialized and provided to defense counsel. (Id.)

In response to these two recent interviews of Yager, Defense counsel seeks to preclude the Government from calling Yager as a witness at the resentencing hearing.

### 3. Stephen Classen

When Defendant confessed to murdering Marti, he also revealed that he had told Stephen Classen about the murder. (Id. at 52.) After obtaining Defendant's statement, Special Agent Thompson interviewed Classen. Classen had been Defendant's cellmate prior to moving in with Marti. (Id.) Shortly after moving in with Classen, Defendant told Classen that he wanted to kill Marti. (Id.) Classen was interviewed a second time by an FBI Special Agent, appeared in the grand jury, and later testified at trial. (Id.)

At trial, Classen testified that on the date scheduled for Marti's transfer to Defendant's cell, a fight occurred in the recreation cage, in which one inmate stabbed another with a plastic knife. (Id. at 53.) Defendant became excited and started screaming to other inmates that the fight was occurring. (Id.) Defendant turned to Classen and said, "I'm going to kill Marti." (Id.) Noticing Classen's apparent horror, Defendant retracted by pointing at Classen and saying, "Got you." (Id.) Marti was moved to Defendant's cell the next day. (Id.) Prior to the move, Defendant put his arm around Classen's neck and asked if Classen thought Defendant could choke him. (Id.) Classen responded, "well, yeah," and Defendant released him. (Id.)

Classen further testified that he had received a note from Defendant after the murder of Marti. (Id.) Classen found the note on the floor of his cell. (Id.) The note stated that Defendant

was serious about killing Marti.  (Id.)  Classen destroyed the note by flushing it down the toilet.

(Id.)

During Classen's testimony, the Government presented a letter purportedly written by

Defendant to Classen.  (Gov. Ex. 35.2.)  The letter was dated April 14, 1996.  The letter stated in

part:

> Steve, I don't care what you say to the FBI or SIS.  There isn't
> anything that can hurt me because their case is pretty much open
> and shut.  I'm sure you were surprised to learn that I had done
> what I told you I was going to do to Marti.

(Id.) According to the Government, this note was seized before it was delivered to Classen.

(Doc. No. 1684 at 53.)  Classen expressed surprise that the Government had a copy of the letter.

(Id.)  Assistant U.S. Attorney Martin responded to Classen that the Government "work[s] in

strange and mysterious ways."  (Doc. No. 1647 at 4.)

At the grand jury proceedings and at trial, Classen testified that he expected a letter of

cooperation from AUSA Martin in support of a Rule 35 motion[1] for his prosecution in Oregon,

and a recommendation to the Bureau of Prisons that he be housed in an institution other than a

penitentiary.  (Doc. No. 1642 at 25.)

Two years ago, in response to discovery requests, the Government disclosed

correspondence between Classen and former AUSA Martin that occurred both before and after

Hammer's 1998 trial.  (Doc. No. 1642 at Ex. 8.)  In the letters, Classen asked when trial would

start and complained about his placement in a county prison while waiting to testify.  (Id.)  The

correspondence showed that following his testimony, the Government sent a letter requesting a

---

[1] Federal Rule of Criminal Procedure 35(b) provides that "[u]pon the Government's motion
made within one year of sentencing, the court may reduce a sentence if the defendant, after
sentencing, provided substantial assistance in investigating or prosecuting another person."
Thus, a Rule 35 motion filed by the Government would provide Classen with the possibility of a
reduced sentence in exchange for his assistance in the Hammer prosecution.

14

sentence reduction and sought to assist Classen with obtaining an earlier release date to a halfway house.  (Id.)

Classen has since died and is therefore unavailable to testify at the resentencing hearing. Based on the correspondence between Classen and former AUSA Martin, Defendant seeks to preclude the Government from admitting the prior testimony of Classen at the resentencing hearing.

## III.    STANDARD OF REVIEW

### A.    The Penalty Phase in General

The Federal Death Penalty Act ("FDPA"), 18 U.S.C. §§ 3591, et seq., sets forth the findings that a fact-finder must make during the penalty phase of a capital case.  First, the fact-finder must determine whether the defendant is eligible for the death penalty by deciding whether the Government has proven beyond a reasonable doubt (1) the defendant is eighteen years or older; (2) that the defendant acted with the requisite intent pursuant to 18 U.S.C. § 3591(a); and (3) the existence of one statutory aggravating factor.  See 18 U.S.C. §§ 3591(a), 3592(c), 3593(c), (e).  If the fact-finder determines that the defendant is eligible, then in a separate hearing, the fact-finder must consider whether the death penalty should be imposed after balancing all of the statutory and non-statutory aggravating and mitigating factors.

### B.    Admissibility of Evidence During the Penalty Phase

Pursuant to the FDPA, during the sentencing portion of a capital case, the Government is required to introduce evidence of a statutorily-based aggravating circumstance that warrants the penalty of death.  18 U.S.C. § 3592.  Once the fact-finder determines beyond a reasonable doubt that one of the statutory aggravating factors applies, the Government may introduce evidence of non-statutory aggravating factors.  United States v. Regan, 228 F.Supp. 2d 742, 749 (E.D. Va. 2002).

During the sentencing phase, the Federal Rules of Evidence do not apply.

See 18 U.S.C. § 3593(c). Evidence supporting aggravating factors, however, must meet a "strikingly high level of relevance and reliability." United States v. Bin Laden, 126 F. Supp. 2d 290, 302 (S.D.N.Y. 2001); United States v. Solomon, 513 F. Supp. 2d 520, 534 (W.D. Pa. 2007) (discussing "heightened reliability" standards for capital sentencing hearings).

In addition to this heightened reliability and relevancy requirement, the probative value of the evidence must outweigh the danger of creating unfair prejudice, confusing the issues, or misleading the jury in order to be admissible. 18 U.S.C. § 3593(c). "The balance of probative value and unfair prejudice must be weighed more carefully in a death penalty case than in normal cases." United States v. Gilbert, 120 F. Supp. 2d 147, 150-51 (D. Mass. 2000).

## IV.    ANALYSIS

As noted, Hammer filed the above listed Motions based on the recently disclosed information. (Doc. Nos. 1640-1651.) The Court will address each Motion seriatim.

### A.    Motion to Supplement/Amend His Motion to Vacate, Set Aside or Correct the Sentence Pursuant to 28 U.S.C. 2255 In Light of Recent Disclosures By the Government (Doc. Nos. 1641, 1642)

In this Motion, Defendant requests permission to vacate or amend his § 2255 habeas petition. Defendant contends that recently disclosed evidence by the Government directly impacts the reliability of his indictment, trial, guilty plea, and the capital sentencing proceedings. (Doc. Nos. 1640-41.) Defendant cites Federal Rule of Civil Procedure 15(a)(2) in support of his contention that the Court should grant leave to amend a pleading when justice so requires. The Government submits that the Court's authority to review Defendant's petition is limited by the successive petition rule, the procedural default doctrine, Defendant's guilty plea, and by the terms of § 2255. For reasons that follow, the Court will deny the Motion.

### 1. The Court Has Discretion to Deny the Motion to Amend

Rule 12 of the Rules governing Section 2255 proceedings for the U.S. District Courts permits application of the Federal Rules of Civil Procedure in habeas cases "to the extent that [the civil rules] are not inconsistent with any statutory provisions or [the habeas] rules" and would not be "inconsistent or inequitable in the overall framework of habeas corpus." Mayle v. Felix, 545 U.S. 644, 654 (2005) (citations omitted). The framework of Section 2255 provides redress for jurisdictional or harmful constitutional errors. While it also applies in rare circumstances to some non-jurisdictional and non-constitutional errors of federal law, it does so only if those errors involve a "fundamental defect which inherently results in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185 (1979); see Reed v. Farley, 512 U.S. 339, 353-354 (1994); United States v. Timmreck, 441 U.S. 780, 784 (1979). Under Federal Rule of Civil Procedure 15(a), a court has discretion to grant leave to amend a pleading after a responsive pleading has been served. The following factors should guide the Court's analysis: (1) undue delay; (2) bad faith or dilatory motive on the part of the movant; (3) repeated failure to cure deficiencies by amendments previously allowed; (4) undue prejudice to the opposing party by virtue of allowance of the amendment; and (5) futility of amendment. Forman v. Davis, 371 U.S. 178, 182 (1962).

Here, Defendant seeks to amend his § 2255 motion with claims alleging that the recently discovered evidence pertaining to Upton, Yager, and Classen violates his constitutional rights. As discussed in detail infra, these disclosures do not demonstrate constitutional violations or a fundamental defect that results in a miscarriage of justice. First, Defendant's conviction for the Upton shooting, even if based on perjured testimony, is not open to collateral attack because Defendant does not claim that he is actually innocent of that shooting, and Upton's recent

17

statements corroborate Defendant's account of the incident in his book. There can be no <u>Brady</u>

violation based on failure to disclose information that was already known to the defense.

Second, even if Yager acted as an agent of the Government, Defendant's right to counsel

had not attached at the time Yager spoke with Defendant because Defendant had not invoked his

right to counsel at his interview with law enforcement. Finally, the correspondence between

Classen and Assistant U.S. Attorney Martin does not reveal information that undermines

Classen's prior testimony. There is no material difference between the benefits noted in

Classen's prior testimony and those revealed in the correspondence. Because Defendant is

unable to establish constitutional errors or at least errors resulting in a fundamental defect that

inherently results in a miscarriage of justice, amendment of his § 2255 petition to add these

claims is not proper. Allowing Defendant to amend his petition at this time would not be

consistent with the overall framework of habeas corpus because his new claims do not allege

supportable constitutional violations.[2]

At the resentencing hearing, the parties will have the opportunity to present all recently

discovered evidence. The Court will then judge the credibility of the testimony and weigh the

evidence as appropriate. While these new facts are certainly relevant and may be admitted as

evidence at the resentencing hearing, they do not demonstrate constitutional violations and thus

do not warrant relief under § 2255. Accordingly, amendment of the § 2255 petition would be

futile and is not appropriate at this time.[3]

---

[2] Because the Court declines to exercise its discretion to grant leave to amend, it need not address the Government's additional arguments that the procedural default doctrine and Defendant's guilty plea bar amendment as well.

[3] The Court also notes that a lengthy evidentiary hearing was already held on the § 2255 petition by Judge Muir, resulting in the denial of Defendant's request to withdraw his guilty plea, but the granting of a new penalty phase hearing. To the extent that Defendant now seeks to add new

**B. Motion in Limine to Preclude the Government from Seeking Death on the Basis of a Prior Conviction and Other Evidence That Was the Product of Perjured Testimony (Doc. Nos. 1643, 1644)**

In this Motion, Defendant seeks to preclude the Government from pursuing this capital prosecution based on evidence of the Upton shooting. (Doc. Nos. 1643, 1644.)  Defendant contends that allowing Upton to testify would violate his Fifth, Sixth, and Eighth Amendment rights and the FDPA.  The Government submits that Defendant is barred from collaterally attacking his conviction for the Upton shooting and that Upton should be allowed to testify at the resentencing hearing.

The Due process Clause and the Sixth Amendment afford a criminal defendant the right to a verdict based on competent, reliable evidence and the law.  Chandler v. Florida, 449 U.S. 560, 574 (1981); United States v. Gaudin, 515 U.S. 506, 514 (1995).  Consideration of a prior invalid conviction is not proper as an aggravating circumstance supporting imposition of the death penalty.  Johnson v. Mississippi, 486 U.S. 578, 586 (1988); Harris ex rel. Ramseyer v. Blodgett, 853 F.Supp. 1239, 1277 (W.D. Wash. 1994) (sentence vacated where aggravating circumstance was supported by conviction that had been dismissed prior to sentencing proceedings); Ward v. State, 827 S.W.2d 110, 114-15 (Ark. 1992) (introduction of unsubstantiated allegations of prior offenses invalidated previous conviction aggravating factor).  Moreover, due process is violated when a sentence "relies on materially false or unreliable information in sentencing a defendant."  United States v. Ruster, 712 F.2d 409, 412 (9th Cir. 1983).

However, "a prior conviction used to enhance a federal sentence is no longer open to direct or collateral attack in its own right" if a "defendant failed to pursue those remedies while

claims to challenge his guilty plea, the reasons advanced above do not warrant the withdrawal of the guilty plea.

they were available" or if the defendant previously attacked his prior conviction without success. Daniels v. United States, 532 U.S. 374, 375 (2001). In other words, once a defendant forgoes the opportunity to challenge his earlier conviction, judicial review "has been closed" and that "defendant is not entitled to another bite at the apple simply because that conviction is later used to enhance another sentence." Id. at 383.

As detailed supra, Upton recently admitted that he testified falsely against Defendant in 1984 and 1998. Contrary to his prior testimony, Upton now states that he voluntarily drove Defendant to his motel to have sex, and was not carjacked or kidnapped on the night of the incident. This new version of events is admissible and relevant at the resentencing hearing. It does not, however, invalidate Defendant's conviction for the Upton shooting. In 1984, Defendant was convicted of kidnapping, robbery with a firearm and shooting with intent to kill in connection with the Upton shooting. This conviction is final and may not be collaterally attacked over twenty years later. Just because the Government seeks to use this prior conviction to enhance Defendant's sentence and new information has been disclosed about the incident, does not open the conviction to direct or collateral attack here. The Government is not seeking to introduce evidence of a prior invalid conviction or unsubstantiated allegations of prior offenses for sentencing purposes. Rather, the Government seeks to introduce evidence of a final adjudicated conviction that has not been reversed, vacated, or invalidated, and which Defendant is precluded from collaterally attacking.

Moreover, Defendant does not now claim that he is actually innocent of the Upton shooting. In fact, while the details recently revealed by Upton contradict Upton's former testimony, they corroborate the Defendant's account of the Upton shooting in his book, "The Final Escape." Upton confirmed Defendant's account that the two met in a gay bar on the night

of the shooting and went to a motel together willingly. Upton also confirmed Defendant's account that Defendant made Upton drive to the outskirts of the city, strip naked, and then shot Upton in the head three times. The allegedly new facts revealed by Upton, therefore, were already known to Defendant. In reality, Defendant and Upton were both aware that Upton was not being honest about the incident, and neither agree that Defendant is innocent of the charges. Therefore, there is no basis for precluding Upton's testimony at the resentencing hearing.

There is also no basis for Defendant's contention that the Government failed to disclose exculpatory evidence related to Upton's perjured testimony in violation of <u>Brady</u>. "Evidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." <u>United States v. Perdomo</u>, 929 F.2d 967, 973 (3d Cir. 1991). Moreover, the Government has disclosed to defense counsel Upton's latest account.

Finally, Upton's testimony during the upcoming sentencing hearing will be subject to cross-examination and can be fully developed by both sides. The Court will have the opportunity to view Upton's testimony and make decisions on credibility at the resentencing hearing. Thus, the Government's use of the Upton shooting conviction as an aggravating factor will not violate Defendant's constitutional rights. The Government may present evidence of Hammer's conviction for the Upton shooting to support the prior firearms conviction aggravator under Section 3592(c)(2).

### C. Motion in Limine to Preclude/Suppress the Testimony of Leonard Yager (Doc. Nos. 1645, 1646)

In this Motion, Defendant seeks to preclude the Government from admitting the testimony of Leonard Yager during the resentencing hearing. (Doc. Nos. 1645, 1646.) Defendant contends that Yager was acting as an agent of the Government when he elicited

evidence from Defendant and allowing him to testify would violate Defendant's constitutional rights. The Government submits that Yager was not acting as an agent of the Government, but even if he was, Defendant's rights were not violated because he had not invoked his right to counsel before meeting with Yager.

Pursuant to the Sixth Amendment, the right to counsel arises at the initiation of adversarial judicial proceedings against a defendant. See Kirby v. Illinois, 406 U.S. 682 (1972). Judicial proceedings against an accused include the "formal charge, preliminary hearing, indictment, information, or arraignment." Id. at 688-89. Thus, when formal criminal charges are brought against an accused, the Sixth Amendment establishes the defendant's right to have an attorney to assist in his defense.

In Massiah v. United States, the Supreme Court held that the Sixth Amendment right to counsel is violated if a confidential government agent deliberately elicits information from a defendant who has been formally charged, in absence of the defendant's counsel. 377 U.S. at 206. In order for a Massiah violation to exist, however, three factors must be present: (1) the right to counsel must have attached; (2) the informant must have been acting as a government agent; and (3) the informant must have deliberately elicited the information in question. See West v. United States, 866 A.2d 74, 84 (D.C. 2005).

Here, Defendant was not under indictment on the morning of April 13, 1996 when he was interviewed by law enforcement personnel and stated that he better get a lawyer. Thus, Messiah does not apply. It is well established that the right to counsel does not attach until charges are filed or until adversary judicial proceedings have begun. Kirby, 406 U.S. at 688-90. For example, in United States v. Gouveia, the Supreme Court held that the defendants, who were suspected of murder in prison, did not have a right to counsel while in administrative segregation

prior to indictment since "[t]he right to counsel does not attach until after the initiation of adversary judicial proceedings." 467 U.S. 180, 187 (1984). While Defendant had confessed to the murder in response to questioning by law enforcement personnel, at that point no adversarial judicial proceeding against him had commenced because he had not been arrested, indicted, or arraigned.

Further, Defendant's statement that he "had better get me a lawyer" did not constitute a clear or unequivocal invocation of his right to counsel. In Davis v. United States, the Supreme Court held that the suspect's statement "Maybe I should talk to a lawyer" during a police interview was too ambiguous to invoke his right to counsel. 512 U.S. 452 (1994). Likewise, Defendant's statement here was too ambiguous to invoke his right to counsel. Considering Defendant had just confessed to the murder of Marti, his remark could be construed as a comment on the damaging nature of his confession.

Even if Defendant did invoke his right to counsel, the Government denies that any law enforcement agent instructed Yager to interrogate Defendant as an agent of the Government. If called to testify, the Government submits that both Agents would "strenuously affirm that they did not instruct anyone to obtain a confession from defendant Hammer." (Id.) In fact, Special Agent Malocu, an assigned case agent, did not meet with Yager until two days after Hammer wrote "The Seven Reasons." (Id. at 77.) Thus, Agent Malocu could not have instructed Yager to induce Defendant to confess to the murder or to write the note intended for Yager. It is also not clear that Yager did anything more than serve as a "listening post." Where a prisoner makes incriminating statements to a passive listener – a "listening post" – the informant's presence does not constitute an interrogation and the right to counsel is not violated. Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

Moreover, there is also no basis for Defendant's contention that the Government failed to disclose exculpatory evidence related Yager. During Yager's testimony, the jury was well aware that he was an informant for the Government trying to obtain a benefit in exchange for information. (Doc. No. 1684 at 77.) Defense counsel had the opportunity to challenge Yager's testimony and self-interest during cross-examination. Yager's credibility as a witness and the details of his cooperation with the Government will likewise be subject to cross-examination and can be fully developed by both sides at the resentencing hearing. It is also notable that Yager denied being enlisted by law enforcement to obtain information from Defendant at the second interview conducted by Haines and FBI Special Agent Coyle, contradicting his statements at the prior interview. Yager also confessed to recently ingesting heroine. The Court will have the opportunity to examine the reliability of Yager's testimony and interview statements and make appropriate credibility determinations at the resentencing hearing.

### D. Motion in Limine to Preclude the Admission of Prior Testimony of Stephen Classen (Doc. Nos. 1647, 1648)

In this Motion, Defendant contends that permitting the Government to admit the prior testimony of deceased witness Stephen Classen would violate his Fifth, Sixth, and Eighth Amendment rights to confrontation, cross-examination, a fair trial, and the heightened procedural safeguards required in capital cases and in the FDPA. The Government submits that any recently disclosed evidence regarding the benefits given to Classen does not undermine his prior testimony or make it unreliable.

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." If a witness becomes unavailable, however, testimony given at a prior proceeding may be introduced if the defendant had a prior opportunity to cross-examine him. Giles v. California,

554 U.S. 353, 358 (2008) (citing <u>Crawford</u>, 541 U.S. at 68.)  Once it is shown that the witness is unavailable to testify, courts generally require that the prior testimony have a certain "indicia of reliability" before it will be allowed into evidence at a subsequent trial.  This generally requires a showing that the accused had an adequate opportunity to cross-examine the witness, that the testimony given is a correct version of the testimony received at the preliminary proceeding, and that the testimony was taken at a regularly constituted judicial proceeding and under oath. 38 A.L.R. 4th 378.

Classen is now deceased and therefore unavailable to testify.  However, he testified under oath at prior judicial proceedings where Defendant was provided adequate opportunity to cross-examine him.  Furthermore, Defendant's argument that this prior testimony is unreliable is without merit.  The correspondence between Classen and former AUSA Martin disclosed two-years ago does not reveal new information that undermines the prior testimony.  Classen testified that he expected and received benefits for his testimony such as a recommendation for a reduced sentence and housing at a facility other than a penitentiary.  (Doc. No. 1648 at 3.)  The fact that the Government also made promises to Classen regarding the conditions of his confinement, his location during his testimony, and earlier release to a halfway house does not impact the reliability of his prior testimony.  The defense is not precluded from eliciting these details at the resentencing hearing.  Since there is not a material difference between the benefits mentioned in his prior testimony and the additional benefits noted in the correspondence, and the evidence of the benefits can be elicited anew at the resentencing hearing, Classen's testimony has not been shown to be unreliable.

Again, the Court will have the opportunity to examine Classen's prior testimony and give proper weight to the correspondence during the resentencing hearing.  The omission of the

additional benefits that were promised to Classen does not materially alter the reliability of his

prior testimony.  While the balance of probative value and unfair prejudice must be weighed

more carefully in a death penalty than in a normal case, admitting the prior testimony of Classen

will not unfairly prejudice Defendant.

> **E. Motion to Preclude the Capital Prosecution Where the Government's Capital Authorization Determination and Subsequent Deauthorization Determinations Relied on Convictions and Evidence that Were the Product of Perjured Testimony in Violation of the Fifth and Eighth Amendments (Doc. Nos. 1649, 1650)**

In this Motion, Defendant contends that the Government's consideration of the Upton

shooting conviction, obtained through perjured testimony, in authorizing the death penalty in this

case violates the Fifth, Sixth, and Eighth Amendments.  The Government submits that it is not

proper for this Court to manage the internal processes of the DOJ in seeking the death penalty

because it violates the separation of powers.  Moreover, the Government argues that the Death

Penalty Protocol does not create enforceable substantive or procedural rights.

In enacting the FDPA, Congress broadly provided that the death penalty may be sought

for a capital offense whenever "the attorney for the government believes that the circumstances

of the offense are such that a sentence of death is justified" and files, within a reasonable time

before trial or acceptance of a guilty plea, a notice indicating that the government will seek the

death penalty.  18 U.S.C. § 3593(a).  In 1995, the Attorney General added to the United States

Attorney's Manual ("USAM") internal policies and procedures "to be followed in Federal cases

in which a defendant is charged with an offense subject to the death penalty."  USAM § 9-

10.010.  Under the Death Penalty Protocol, the United States Attorney provides defense counsel

with a "reasonable opportunity" to present mitigating evidence before he or she makes a

recommendation whether to seek the death penalty.  USAM § 9-10.050.  After the United States

Attorney's recommendation, the Committee reviews the case, again providing defense counsel

with an opportunity to present mitigation evidence, and makes its own recommendation.  USAM

§ 9-10.120.  The Committee's recommendation is submitted to the Attorney General, who makes

the final decision as to whether to seek the death penalty.  The USAM states that "[n]o final

decision to seek the death penalty shall be made if defense counsel has not been afforded an

opportunity to present evidence and its argument in mitigation."  USAM § 9-10.120.

The USAM "is not intended to, does not, and may not be relied upon to create any rights,

substantive or procedural, enforceable at law by any party in any matter civil or criminal."  See

USAM § 1-1.100.  The Protocol therefore does not create any substantive or procedural rights

enforceable by a defendant.  See In re United States, 197 F.3d 310, 316-17 (8th Cir. 1999)

(collecting cases).  Rather, the Protocol is designed to enhance the DOJ's internal management of

capital cases.

Accordingly, the Court agrees with those courts that have concluded that the DOJ

Protocol does not create an enforceable right of entitlement.[4]  See United States v. Lee, 274 F.3d

485, 493 (8th Cir. 2001) (agreeing with those courts which have concluded that the death penalty

protocol is unenforceable by individuals); United States v. Torrez-Gomez, 62 F. Supp. 2d 402,

406 (D.P.R. 1999) (the accused neither obtains nor possesses any rights at the Department of

Justice death penalty committee hearing); United States v. Feliciano, 998 F. Supp. 166, 168-69

(D.Conn. 1998) (relying on the "dearth of case law on this issue" to find that the death penalty

protocol does not create substantive or procedural rights); United States v. McVeigh, 944 F.

Supp. 1478, 1483 (D.Colo. 1996) ("The Protocol did not create any individual right or

entitlement subject to the due process protections applicable to an adjudicative or quasi-

---

[4] The Court notes that a ruling was made on the same issue in an Opinion of this Court dated
December 1, 2011.  (Doc. No. 1414.)

adjudicative governmental action.")  The Third Circuit has held that the Government may

deviate from its own internal protocols without creating a right capable of review or enforceable

by defendants.  See United States v. Wilson, 413 F.3d 382, 389 (3d Cir. 2005); see also United

States v. Lopez-Matias, 522 F.3d 150, 155-56 (1st Cir. 2008) (death penalty protocol is

unenforceable by individuals).

    In addition, the separation of powers also constrains the authority of this Court to

supervise prosecutorial decisions.  See Young v. United States ex rel. Vuitton et Fils S.A., 481

U.S. 787, 807 (1987) (noting that in our adversarial system, investigatory and prosecutorial

decisions are "made outside the supervision of the court"); see also United States v. Cox, 342

F.2d 167, 171 (5th Cir. 1965) ("It follows, as an incident of the constitutional separation of

powers, that the courts are not to interfere with the free exercise of the discretionary powers of

the attorneys of the United States in their control over criminal prosecutions.")

    The parties do not dispute that the Protocol in death penalty cases has been followed here.

According to the Government, after the initial certification process, Defendant had two

opportunities, first on April 23, 2010 and again on August 7, 2013, to provide additional

submissions to the DOJ to seek decertification.  (See Doc. No. 1684 at 70.)  After considering

these submissions, the United States Attorney, the Committee, and the Attorney General

conducted the appropriate review and decided not to decertify the case.  The Justice Department

had independent discretion to make this decision.  It is improper for the Court to now intervene

to determine whether this decision is warranted.  The separation of powers constrains the

authority of this Court to supervise such prosecutorial decisions.  Moreover, as noted, the

Protocol does not create individual rights that Defendant can enforce.  For all these reasons, the

defense's challenges to the Government's authorization process are without merit.

**F. Motion in Limine to Dismiss This Capital Proceeding Because of the Government's Presentation of Perjured Testimony and Repeated Misconduct in Suppressing a Substantial Volume of Material Exculpatory and Impeachment Evidence and Its Use of Clandestine Agent to Illegally Gather Incriminating Evidence (Doc. Nos. 1651, 1652)**

In this Motion, Defendant asserts that the Government should not be allowed to pursue the death penalty against him because it has engaged in a pattern of misconduct ranging from actively suppressing evidence to illegally gathering evidence and presenting perjured testimony with respect to this case. (Doc. No. 1651 at 5.) This Motion is again predicated on the same recently disclosed evidence regarding Upton, Yager, and Classen as delineated above. Defendant also reasserts his argument that the Government failed to disclose material exculpatory evidence which was the foundation for Judge Muir's Brady violation ruling. The Government submits that it did not have a duty to disclose evidence setting forth facts that Hammer already knew himself or had reason to know.

As detailed above, the recently disclosed information does not demonstrate a pattern of misconduct by the Government. With respect to Upton's perjury, there can be no Brady violation based on failure to disclose information that was already known to the defense. Moreover, there is no evidence that the Government improperly withheld such evidence. With respect to Yager, even if he did act as an agent of the Government, the Government did not violate Defendant's right to counsel and did not fail to disclose exculpatory evidence regarding Yager's actions. With respect to Classen, the difference between Classen's former testimony and the information disclosed in the correspondence also does not demonstrate a Brady violation. Thus, the recently disclosed evidence does not demonstrate Brady violations by the Government.

Defendant also argues that the Brady violations disclosed during the prior § 2255 hearing before Judge Muir along with the new disclosures in regard to Upton, Yager, and Classen, show

that the Government has engaged in a pattern of misconduct.  The prior violations were fully adjudicated by Judge Muir.  Following a lengthy § 2255 hearing, Judge Muir ruled that the prior sentencing proceeding was constitutionally defective and ordered a new sentencing hearing. This granted Defendant all of the relief to which he is entitled.  This Court will not make additional rulings on the earlier Brady violations since they have already been ruled on and relief has already been granted.  Moreover, any information revealed by the Government regarding Upton, Yager, and Classen does not warrant relief as noted above.  For these reasons, the Court does not find a pattern of misconduct by the Government and Defendant's Motion will be denied.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

DAVID PAUL HAMMER,

Defendant.

CRIMINAL ACTION
NO. 4:96-CR-0239

## ORDER

**AND NOW**, this 27th day of May 2014, upon consideration of Defendant's Motion to

Vacate, Set Aside or Correct the Judgment and Sentence Pursuant to 28 U.S.C. 2255 In Light of

Recent Disclosures by the Government (Doc. Nos. 1640, 1641, 1642), Defendant's Motion in

Limine to Preclude the Government from Seeking Death on the Basis of a Prior Conviction and

Other Evidence that was the Product of Perjured Testimony (Doc. Nos. 1643, 1644), Defendant's

Motion in Limine to Preclude the Testimony of Leonard Yager (Doc. Nos. 1645, 1646),

Defendant's Motion in Limine to Preclude the Admission of Prior Testimony of Stephen Classen

(Doc. Nos. 1647, 1648), Defendant's Motion to Preclude the Capital Prosecution Where the

Government's Capital Authorization and Subsequent Deauthorization Determinations Relied on

Convictions and Evidence that were the Product of Perjured Testimony (Doc. Nos. 1649, 1650),

Defendant's Motion to Dismiss this Capital Resentencing Because of the Government's

Presentation of Perjured Testimony and Repeated Misconduct in Suppressing a Substantial

Volume of Exculpatory and Impeachment Evidence (Doc. Nos. 1651, 1652), and the

Government's Consolidated Opposition (Doc. No. 1684), and in accordance with the Opinion of

the Court issued this day, it is **ORDERED** as follows:

31

1.  Defendant's Motion to Vacate, Set Aside or Correct the Judgment and Sentence Pursuant to 28 U.S.C. 2255 In Light of Recent Disclosures by the Government (Doc. Nos. 1640, 1641, 1642) is **DENIED**.

2.  Defendant's Motion in Limine to Preclude the Government from Seeking Death on the Basis of a Prior Conviction and Other Evidence that was the Product of Perjured Testimony (Doc. Nos. 1643, 1644) is **DENIED**.

3.  Defendant's Motion in Limine to Preclude the Testimony of Leonard Yager (Doc. Nos. 1645, 1646) is **DENIED**.

4.  Defendant's Motion in Limine to Preclude the Admission of Prior Testimony of Stephen Classen (Doc. Nos. 1647, 1648) is **DENIED**.

5.  Defendant's Motion to Preclude the Capital Prosecution Where the Government's Capital Authorization and Subsequent Deauthorization Determinations Relied on Convictions and Evidence that were the Product of Perjured Testimony (Doc. Nos. 1649, 1650) is **DENIED**.

6.  Defendant's Motion to Dismiss this Capital Resentencing Because of the Government's Presentation of Perjured Testimony and Repeated Misconduct in Suppressing a Substantial Volume of Material Exculpatory and Impeachment Evidence (Doc. Nos. 1651, 1652) is **DENIED**.

BY THE COURT:

_Joel Slomsky_
JOEL H. SLOMSKY, J.